**Opinion issued July 9, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————————

**NO. 01-22-00877-CR**

———————————————

**DUDLEY JOSEPH BERNARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 122nd District Court**
**Galveston County, Texas**
**Trial Court Case No. 19-CR-3701**

---

## MEMORANDUM OPINION

A jury found Appellant Dudley Joseph Bernard guilty of the felony offense of murder and the trial court assessed his punishment at 30 years in prison. In two issues, Appellant argues (1) the trial court erred in overruling his motion for directed verdict because "the evidence is insufficient to prove he committed murder, rather

than acting in self-defense," and (2) the trial court abused its discretion in excluding testimony from his forensic nursing expert concerning bullet trajectory.

We affirm the trial court's judgment.

## Background

On Thanksgiving day, November 28, 2019, Appellant Dudley Joseph Bernard shot his wife Chauntelle Bernard nine times, twice in the torso and seven times in the head. Bernard was arrested and charged with Chauntelle's murder. At trial, Bernard argued he shot Chauntelle in self-defense.

### A.    Opening Statements

In its opening statement, the State told the jury that the evidence would show that Bernard and Chauntelle hosted family and friends at their home on Thanksgiving in 2019, including Chauntelle's friend, Alison McDowell. Everything was going well that day until 11 p.m. when Alison left and Bernard and Chauntelle walked her outside. According to the State, Bernard gave Alison a goodbye hug that made both Alison and Chauntelle "uncomfortable." Trinell Merricks, Chauntelle's sister, was inside the house. She heard a "thud" and then Chauntelle and Bernard burst through the back door of their home. Bernard grabbed his keys and went back outside, while Chauntelle locked the back door and told their 8-year-old son to go upstairs. Chauntelle told Trinell that Bernard was going to get his gun. Chauntelle

2

walked to the front door and looked out a front window at Bernard's truck, which is where Bernard kept his gun.

The State continued. After retrieving his gun, Bernard kicked down the back door, pushed past Trinell "with a rage in his eyes," and approached Chauntelle. According to the State, Chauntelle, who "ha[d] gotten her gun at this point because [she was] fearful" of Bernard, tussled with Bernard and "then gunshots start[ed] going off." Trinell ducked when she heard the gunshots and when she looked up, she saw Bernard step back and shoot Chauntelle. According to the State, Bernard shot Chauntelle in the left side of her arm, her left flank, and the left side of her head. Chauntelle fell to the ground and Bernard stood over her and "just finishe[d] unloading right into the back of her head with a 45-caliber Glock." According to the State, Chauntelle's "gun [went] off during all this" because they found one casing from her gun.

In his opening statement, Bernard's counsel told the jury that Chauntelle and Bernard had some sort of dispute outside after Alison left. After Chauntelle and Bernard came back inside the house, Bernard grabbed his keys and went to his car. Bernard intended to leave for the night, but he had to go back inside to retrieve his wallet, which was in the master bedroom. Bernard, who could not open the back door because it was locked, looked through the window and saw "Chauntelle and Trinell in the front hallway, and Chauntelle [was] wildly waving around her gun."

3

Defense counsel stated the evidence would show that Bernard burst in the back door, which he had a legal right to do, and he tried to "de-escalate Chauntelle." Chauntelle and Bernard "g[o]t in a tussle because he [was] trying to disarm her" and "while he [was] trying to disarm her, she fire[d]" her gun. Defense counsel stated that although the police recovered only one casing from Chauntelle's gun, "there [were] two shots that the police believe she fired that ended up in the dining room wall." According to defense counsel, the evidence would show that Chauntelle "fired first, and that when [Bernard] fired, he was firing in self-defense."

## B.    Trial Testimony

### 1.    Trinell Merricks

Chauntelle's sister, Trinell Merricks, was the State's first witness. Trinell testified that Bernard and Chauntelle were married approximately ten years and had two children. Their oldest son C.B. ("Charlie") was eight years old when Chauntelle was killed, and their youngest son L.B. ("Lucas") was five years old.[1] Chauntelle worked for the United States Customs and Border Protection as a law enforcement officer, and Bernard worked for the agency as an agricultural specialist.

---

[1]    We will use a pseudonym when referring to anyone who was a minor when the shooting occurred. *See* TEX. R. APP. P. 9.10(a)(3); *see also Fernandez v. State*, 597 S.W.3d 546, 551 n.4 (Tex. App.—El Paso 2020, pet. ref'd) (using minor party's initials to protect her identity).

4

The morning of the shooting, Chauntelle and Bernard were hosting Thanksgiving day festivities at their home for family and friends. Trinell, her 11-year-old son K.M. ("Kenny"), and Trinell's and Chauntelle's mother, Myrna Merricks, were at the Bernards' home helping them prepare food and ready the home for guests. Chauntelle's friend from work, Alison McDowell, attended the holiday gathering with her two children and her mother. The family and friends ate, played board games, watched football, and talked to other family members using FaceTime.

In the late afternoon, Chauntelle, Trinell, and Alison went shopping to take advantage of some of the Thanksgiving sales. After the trio returned to the home that evening, Chauntelle's and Bernard's next-door neighbors Judy Jones-Vaughan and her husband, Daryl Vaughan, came over with their son. The Vaughans brought a bottle of champagne with them which they shared with Alison and Bernard. Judy, Daryl, and their son left soon afterwards.

Alison and her family left around 11:00 p.m. According to Trinell, everyone said goodbye to Alison and her family at the back door, including Chauntelle and Bernard. After they said their goodbyes, Chauntelle and Bernard walked Alison and her family to their car, which was parked in the driveway. Trinell testified that after she told Alison goodbye, she went to the living room to watch a movie. Lucas, who had dozed off earlier that night, was asleep in the downstairs master bedroom when Alison and her family left and Myrna, Charlie, and Kenny were upstairs. After

5

Chauntelle and Bernard walked outside to walk Alison to her car, Charlie came downstairs and went to the kitchen to get a glass of milk.

When Charlie was getting his glass of milk, Trinell heard a loud "thump" from outside that sounded like something had hit one of the windows and then Chauntelle and Bernard "burst through the back door." Bernard immediately grabbed his car keys, which were next to the back door, and walked back outside. Chauntelle deadbolted the back door and told Trinell not to open it because Bernard was going to get his gun from his truck, which was parked on the street in front of the house.

After she told Charlie to go upstairs, Chauntelle walked to the front foyer and looked at Bernard's truck through a window in the formal dining room which was adjacent to the front door. Trinell briefly lost sight of Chauntelle when she stepped into the dining room. Trinell asked Chauntelle what had happened, but Chauntelle, who was staring intently out the window, did not respond to Trinell.

The next thing Trinell remembered, Bernard kicked open the back door and quickly walked towards Trinell with a gun in his hand. Trinell, who was standing halfway between the back door and the front foyer, testified that Bernard was visibly angry and "enraged." Trinell told him to stop, and she asked him what was going on, but Bernard, who was "moving really quickly," brushed past Trinell while holding his handgun at his side. He walked directly over to Chauntelle, who was standing nearby in the front foyer.

According to Trinell, Chauntelle and Bernard began "tussling" and Trinell could not "see what's going on in front of [Chauntelle and Bernard] because they [were] facing each other." When Trinell turned to walk over and try to separate Bernard and Chauntelle, Trinell heard gunfire and she ducked down by a sofa. Trinell did not see who fired the first gunshots because Bernard had his back to Trinell, and he was partially blocking her view of Chauntelle. When Trinell looked up, she saw Bernard step back and shoot Chauntelle several times in the "upper body area." Chauntelle fell face down on the floor and Bernard "st[ood] over her, and he just continue[d] shooting . . . in her head." According to Trinell, Chauntelle never moved after she fell to the floor. Bernard then looked over at Trinell while still holding the gun in his hand, and Trinell ran out the back door, screaming for help. After Trinell saw Bernard walk out the front door and down the street, she ran back into the home to get Myrna and the boys. The police, who arrived as Trinell was walking Lucas and Myrna outside the house, escorted Kenny and Charlie out of the home.

At some point after Bernard walked out the front door and before the police arrived, Trinell spoke to a 911 operator. Trinell told the operator there had been an altercation outside the Bernards' home when some of the guests left. Trinell reported that they locked the doors, but Bernard broke the door open, and then shot and killed her sister Chauntelle. According to Trinell, after the shooting, her mother Myrna

7

took the gun away from Bernard, put the gun down, and then went upstairs. Trinell repeatedly screamed throughout the 911 call that Bernard had killed her sister.

When asked about Chauntelle's and Bernard's relationship, Trinell testified that Chauntelle had been "overwhelmed with her marriage" and she and Chauntelle had discussed Chauntelle and Bernard attending marriage counseling. She also suggested to Chauntelle that she get individual counseling because Trinell thought Chauntelle "needed to talk to someone about herself, what she needed for herself." Despite the couples' past problems, Trinell did not see any signs of hostility between Chauntelle and Bernard before Alison left. Trinell testified that she saw Bernard give Chauntelle a back rub the day of the shooting, which Trinell previously had described as an act of affection.

Trinell, who was questioned extensively about whether Chauntelle had a gun, testified repeatedly that she did not remember seeing Chauntelle with a gun in her hand at any time that day. Despite not having seen Chauntelle retrieve her gun after Bernard walked out to his truck or knowing where Chauntelle would have retrieved her gun from, Trinell testified that it was not "possible that [Chauntelle] was already armed" when Chauntelle and Bernard walked back in the house after seeing off Alison and her family. Trinell testified that she did not see Chauntelle waving a gun around or holding a gun in her hand before Bernard kicked open the back door. She never felt that Chauntelle posed a danger to herself, Myrna, or the boys.

8

Trinell did not remember telling the police that she saw Chauntelle with a gun or making a statement to family members that day after the shooting indicating that Chauntelle and Bernard were tussling because Bernard was trying to take Chauntelle's gun away from her.

### 2. Charlie

Charlie, who was 11 years old at the time of trial, testified that his grandmother Myrna, aunt Trinell, cousin Kenny, and some family friends came to his home on Thanksgiving day. When his parents went outside to say goodbye to one of their friends, Charlie went downstairs to get a glass of milk. Trinell was already downstairs watching a movie. The next thing Charlie remembered was Chauntelle "running in saying, you slapped me" and then she told Charlie to go upstairs. Charlie did not see anyone else come inside the house with Chauntelle.

After he went upstairs to his room, Charlie heard Bernard kick down the back door and Charlie heard people "yelling and stuff," but he did not remember what anyone said. Charlie walked out of his room, and when he looked downstairs, he saw Trinell "trying to break [Chauntelle and Bernard] apart," and then he heard a gunshot. When asked what he saw next, Charlie testified, "I saw my mom on the ground and my dad saying sorry and bye, [Charlie], [Lucas]." According to Charlie, Chauntelle was lying on the floor in the front foyer and Bernard standing near the front door preparing to leave. Charlie did not see anything in Bernard's hands before

9

he walked out the front door. When asked if he had seen either of his parents holding a gun that evening, Charlie testified that he saw his mother holding her gun in her right hand and he thought she was "protecting herself or trying to use it."[2] Charlie testified that Chauntelle kept her gun in a box or a safe in her bedroom, which was on the first floor. He denied seeing Bernard holding a gun that evening.

After Bernard walked out the front door, Charlie went to Kenny's room and told him what had just happened. The boys sat in the bedroom and waited until the police arrived. The police took the boys to the Vaughns' home.

### 3.   Myrna

Chauntelle's mother, Myrna, who had gone upstairs to her bedroom after saying goodbye to Alison, was lying in bed when she heard someone hitting or pushing against the back door. When Myrna got up to investigate the noise, she looked over the balcony and saw Bernard push open the back door and come inside "with a force." According to Myrna, Bernard was "in a rage" and he had a gun in his hand. Myrna testified that she and Charlie, who was upstairs with her, started yelling and Chauntelle told Myrna to stay upstairs. After she heard gunshots, Myrna went downstairs and saw Chauntelle lying on the floor. Myrna looked for Trinell who at this point had run outside and was standing in the street crying hysterically. When asked if she picked up anything, Myrna testified there was a clip on the kitchen

---

[2]      The record reflects that Chauntelle was left-handed.

10

counter, but she did not know how it got there. Myrna testified that Chauntelle and Bernard had been "getting along" earlier that day and she did not know why Bernard shot her daughter.

### 4. Judy Jones-Vaughan and Daryl Vaughan

Judy and Daryl were Chauntelle's and Bernard's nextdoor neighbors. Judy, Daryl, and their adult son went to the Bernards' home at around 6:30 p.m. on Thanksgiving day, and they returned home around 8:30 p.m. Judy was awoken at 11 p.m. when Myrna knocked loudly on Judy's front door and yelled, "Ms. Judy, Ms. Judy, he killed my daughter." When Judy and Daryl went outside to investigate, they saw Bernard standing on the street corner and he appeared to be talking to someone on his phone. The police, who arrived at the Bernards' home shortly after, brought Myrna, Trinell, and the boys to Judy's and Daryl's home. The three children were "very, very quiet" and appeared to be in shock. According to Judy, Charlie was "sobbing, but quietly sobbing and shaking, and he did that for hours." Charlie told Judy, "tomorrow is my birthday."

### 5. Alison McDowell

Alison McDowell testified that she worked at the United States Customs and Border Protection agency with Chauntelle and Bernard. In addition to being co-workers, Alison and Chauntelle were good friends, and according to Alison, they were close like sisters. Alison, who described Chauntelle as outspoken, testified that

11

when Chauntelle was angry with her, Chauntelle would just "say what she wanted to say."

Alison, her sons, and her mother went to Chauntelle's and Bernard's home on Thanksgiving day. Alison and her family left at 11:00 p.m. Before they walked out the door to their car, Bernard gave Alison a hug as they stood by the back door. Alison testified that Bernard pressed her "whole upper body against his body," and she thought it was inappropriate and it made her uncomfortable. Alison testified that she did not know where Chauntelle was when Bernard hugged her.

When asked about Chauntelle's and Bernard's relationship, Alison testified that Chauntelle considered divorcing Bernard a year or two before the shooting, but she never carried through with any plans for a divorce. According to Alison, "[t]hings were going well" between Chauntelle and Bernard for three or four months before the shooting and she saw Bernard massage Chauntelle's shoulders on Thanksgiving.

### 6. Dr. Ami Murphy

Dr. Ami Murphy, the medical examiner who conducted Chauntelle's autopsy, testified that Chauntelle's death was caused by penetrating and perforating gunshot wounds of the head, torso, and extremities. According to Dr. Murphy, Chauntelle sustained nine gunshot wounds, seven gunshot wounds to her head and two gunshot

12

wounds to her torso. There was no evidence that Chauntelle received any gunshot wounds to the front of her body.

With respect to Chauntelle's head injuries, Dr. Murphy testified that she observed six entrance wounds on the back of Chauntelle's head, and a seventh entrance wound on the left side of her head. Each of the gunshot wounds would have been fatal. Although she was able to identify the entrance wounds, Dr. Murphy was unable to determine the corresponding exit wounds because of "the number of shots that went through the head and the amount of damage" inflicted by the bullets.

With respect to the two gunshot wounds to Chauntelle's torso, Dr. Murphy testified that one bullet punctured Chauntelle's upper left arm near her shoulder, and the bullet associated with that wound punctured Chauntelle's left lung, perforated her heart, and eventually lodged in her right breast. According to Dr. Murphy, this wound would have been fatal because Chauntelle would have lost a substantial amount of blood very quickly and the damage to her heart would have been almost impossible to repair. Chauntelle sustained a second gunshot wound near her left breast, and the bullet associated with this wound damaged her ribs, intestines, left kidney, stomach, liver, and two of her vertebrae before becoming lodged in her lower right back. According to Dr. Murphy, this wound would not have been immediately fatal and Chauntelle could have survived with medical treatment.

Dr. Murphy testified that although she could not give an opinion regarding the order in which Chauntelle's gunshots wounds occurred, she knew Chauntelle was alive when she sustained at least one or more of her head wounds because of the bleeding on the floor around her head. Dr. Murphy, who had performed over 2,500 autopsies and testified in court many times as an expert witness, testified that she could not give an opinion regarding the order in which Chauntelle's gunshots wounds occurred or the position of Chauntelle's body when she was shot. Dr. Murphy was only able to opine as to the path the bullets or bullet fragments took as they traveled through Chauntelle's body. When asked on cross examination if it "would be more or less likely" that Chauntelle was "upright rather than prone" when she was shot in the head and torso, Dr. Murphy testified "it could be either."

### 7. The Investigation

Officer Trevor Rector, Sergeant Austin Frakes, evidence technician Alex Hansen, evidence and forensic manager Andrew Saum, and retired Detective Marty Grant with the League City Police Department testified for the State. Officer Rector was the first officer to arrive at the scene, and Sergeant Frakes arrived at the Bernards' home a few minutes later. Hansen and Saum were dispatched to the Bernards' home later that night to collect evidence and Detective Grant, who investigated the shooting, arrived on the scene a few hours later.

14

After he shot Chauntelle, Bernard walked outside and called 911 at 11:07 p.m. A recording of the call was admitted into evidence as State's Exhibit 1. Bernard calmly gave the operator his home address, said "I'm at the corner" and "I'm done," and then hung up. When the operator called Bernard back a minute later, Bernard told the 911 operator that he had just "accidentally" killed his wife and then he hung up again. The 911 operator called Bernard back a second time and asked Bernard where the gun was. Bernard told the operator that the gun was in the house, and he was waiting outside for the police to arrive.

Officer Rector testified that Bernard was standing on the street corner with his hands raised when he arrived. Bernard complied when Officer Rector instructed him to lay on the ground, and he told Officer Rector that his wife was dead. After Sergeant Frakes arrived, he and Officer Rector detained Bernard and took him into custody without incident. Officer Rector and Sergeant Frakes testified that Bernard seemed unusually calm for having just killed his wife. According to Officer Rector, Bernard did not have any visible injuries and told the officers that he had not been shot.

Detective Grant began his investigation into Chauntelle's death by meeting with Bernard, Trinell, and Myrna at the police station a few hours after the shooting. According to Detective Grant, Bernard was "extremely calm," and he did not cry or seem to be excited. Bernard told Detective Grant that there was property that

15

belonged to the United States Customs and Border Protection agency at his home, he told the detective where to find that property, and he instructed him to return the property to the agency. Bernard also told Detective Grant to "follow the evidence." Detective Grant thought that it was strange that Bernard was telling him what to do. Bernard declined to speak with Detective Grant other than to consent to having his hands tested for gunshot residue and offering to consent to the search of his home.

The police recovered two handguns from the Bernards' home. One handgun, an H&K-40-caliber pistol, was found on the floor next to Chauntelle's body and it was later found to have Chauntelle's DNA on it. The magazine had been ejected from Chauntelle's handgun, but there was one unfired bullet in the gun's chamber. A Glock-45-caliber pistol was found in its holster on a folding table in the living room between the back door and the front foyer. No DNA determination could be made for the Glock pistol.

The police also found a 40-caliber magazine and a 45-caliber magazine on the floor next to Chauntelle's handgun. The 40-caliber magazine, which can hold 12 rounds, had ten live, unfired rounds. The 45-caliber magazine, which fits a Glock-45-caliber pistol, was empty. The 45-caliber magazine can hold 13 rounds. They recovered 13 expended 45-caliber shell casings and one expended 40-caliber shell casing. The police also found three magazines with 45-caliber bullets that fit a Glock-45-caliber pistol and a holster in Bernard's truck, which was parked on the

16

street in front of the home with its door ajar.  The lock on the back door of the house was broken and the doorframe had been damaged because it had been forced open.

Detective Grant testified there was a dining room to the left of the front door, and he observed two holes in the wall dividing the kitchen from the dining room, which he deduced were bullet holes.  The police, however, were not able to find the bullets and they stopped searching for them because the bullets "appeared to have gone into the studs and possibly some – a second set of studs" and the officers were advised not to proceed further because the wall might be load-bearing.

Detective Grant testified that Chauntelle was left-handed, and that he believed the two gunshots had been "fired close together whenever [Chauntelle and Bernard] were close together in the foyer because . . . they had gone off to the left," towards the dining room.  Detective Grant thought that one of the bullets in the dining room was fired by Chauntelle's gun, and the other bullet was from Bernard's gun.  When asked why he thought the two gunshots fired into the dining room were from different guns, Detective Grant testified that Chauntelle's gun had a 12-round magazine, and all 12 rounds were accounted for.  According to Detective Grant, the police found one shell casing from Chauntelle's handgun next to her body, one bullet in the chamber, and 10 unfired rounds in the magazine. Detective Grant acknowledged that they had not been able to retrieve the bullets from the dining room wall.  If the police had been able to extract the bullets, they could have tested

17

them to determine whether they were fired by Chauntelle's H&K-40-caliber pistol or Bernard's Glock-45-caliber pistol.

Detective Grant testified that he initially believed Chauntelle had fired the first shot, and he shared that information with defense counsel, but Detective Grant's theory of the case changed after he reviewed additional evidence, including the footage recorded by a neighbor's security camera. The recording, which was admitted into evidence as State's Exhibit 26, recorded the sound of the gunshots fired inside the Bernards' home. After reviewing the recording, Detective Grant concluded that the first gunshot was a "distinct bam," the second gunshot sounded like the "same bam" followed almost immediately by a third gunshot. Detective Grant testified, "In my opinion, you can tell [the third gunshot is] from a different gun." The third gunshot was followed by two more gunshots that sounded like the first two gunshots. The first five gunshots were followed by a short gap, followed quickly by a succession of ten more gunshots that sounded like the first two gunshots. According to Detective Grant, none of the subsequent gunshots recorded by the security camera sounded like the third gunshot. Detective Grant testified that Chauntelle fired one shot because they found one shell casing that matched the caliber of her gun near her body.

Despite having testified that Chauntelle fired the third gunshot, Detective Grant testified on cross-examination that Chauntelle fired the first shot. On redirect,

18

however, Detective Grant testified that he misspoke when he testified that Chauntelle fired the first shot, because the security camera recording indicated that the third gunshot was fired by Chauntelle's gun.

When asked if Chauntelle would have acted in self-defense if she had shot at Bernard "when he kicked down the door with the gun," Detective Grant testified they had not found any evidence indicating Chauntelle shot at Bernard when he kicked open the back door and forced his way inside the house, but "after knowing everything now, I think it would have been justified." Detective Grant was "shocked" and "surprised" that Chauntelle did not "open fire on [Bernard] and just cut him down" as he "came barreling through" the back door.

Detective Grant acknowledged that Bernard had the legal right to force open the back door and reenter his home, and that it would have been reasonable for Bernard to attempt to disarm Chauntelle if Bernard believed that his family was in danger and had he seen Chauntelle waving a gun around in the home. According to Detective Grant, "no one ever, ever at any time gave me [the] impression that [Chauntelle] was running around waving the gun."

Detective Grant also testified that even though Trinell testified she did not know where Chauntelle had gotten her gun or even remembered seeing Chauntelle with a gun that day, Trinell told him that Chauntelle had "gone to get her gun" and

"she had seen the gun," and Detective Grant was "still of the opinion that she got the gun in the front by the door, and I'm still convinced of that."

## C.    Motion for Directed Verdict

After the State rested its case, Bernard moved for a directed verdict:

> At this time I would move for a directed verdict. I think the primary testimony that establishes our entitlement to one is that of Detective Marty Grant. And what we have is testimony that fails to establish and I think serves to illustrate that the State cannot establish to any reasonable juror beyond a reasonable doubt that the defendant did anything unlawful. We have ambiguity on who shot first. I think the weight of the evidence is that she did. The -- Detective Grant concedes that his entry into the home was legal. He concedes that a decision to try to disarm her would be legal and lawful. And if those are true, I don't know the moment when it's supposed to turn unlawful if it's not -- if it's -- if it's supposed to occur sometime before she fires. And so, with that, Judge, we'd ask for a directed verdict.

The trial court denied the motion.

## D.    Charge Conference

During the charge conference, Bernard requested an instruction on self-defense. The State argued that Bernard was not entitled to an instruction on self-defense because there was no evidence that Bernard subjectively believed Chauntelle was using or attempting to use unlawful force or unlawful deadly force against him and that his use of force or deadly force in response was immediately necessary. The trial court found that the issue of self-defense had been raised by the evidence and included the requested instruction on self-defense in the charge. *See*

20

*Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017) ("A defendant is entitled to a jury instruction on self[-]defense if the issue [of self-defense] is raised by the evidence, whether that evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may think about the credibility of the defense.").

## E.    Closing Arguments

In his closing argument, defense counsel argued that Bernard was not guilty because he had acted in self-defense when he shot Chauntelle, and the State had not proven beyond a reasonable doubt that he intended to kill Chauntelle or cause her serious bodily injury.[3] According to defense counsel, Bernard had multiple opportunities to shoot Chauntelle before they tussled in the front foyer and that his decision to attempt to disarm her, as opposed to shooting her, indicated he did not intend to kill her.

Defense counsel argued that Bernard had acted in self-defense when he shot and killed Chauntelle, because he was scared for his family's safety after he saw Chauntelle waving her gun around and she shot at him when he tried to disarm her. Defense counsel argued that despite testifying she did not remember seeing Chauntelle with a gun, Trinell told Detective Grant shortly after the shooting that she saw Chauntelle holding a gun. Trinell ducked after she heard two gunshots, and

---

[3]    The State waived its right to argue first.

21

when she looked up, she saw Bernard shoot Chauntelle three times, twice to her torso and once on the left side of her head. According to defense counsel, Detective Grant testified that Chauntelle fired the first shot, and that Bernard was trying to disarm her, but after meeting with the State during a break in his testimony, Detective Grant "changed his opinion" and claimed that Bernard had fired his gun first and that he was "trying to disarm [Chauntelle] to kill her." He also argued that Trinell did not dispute telling Detective Grant and others that Bernard had been "trying to get the gun away from Chauntelle."

Defense counsel argued that, based on Detective Grant's and Dr. Murphy's testimony, one of the two gunshots to Chauntelle's torso was fatal and one of them damaged her spinal cord and caused lower paralysis. According to defense counsel, this led to the conclusion that Chauntelle fired the first two gunshots. According to defense counsel, "we can state with almost certainty that those first two shots came from Chauntelle. If you believe Trinell, you take her at her word, you know he didn't fire until [Chauntelle] did."

Defense counsel argued that Detective Grant "waffle[d] so hard back and forth about who shot first" because his "theory for two-plus years [was] that Chauntelle fired first" and Bernard was "trying to disarm her." According to defense counsel, Detective Grant changed his mind before trial after "listening to the audio [of the security camera], [and] he thinks the shots sound[ed] different." Defense counsel

argued that Trinell did not dispute that Chauntelle had been waving her gun around because when he asked Trinell if this occurred, Trinell testified she did not recall seeing Chauntelle with a gun.[4] According to defense counsel, Detective Grant testified that Bernard had a "legal right to enter his home, even violently" and Bernard had a legal right to "approach Chauntelle. . . if he saw her waving that gun around through the window," and once "he started to disarm her and she fired, he had a legal right to use self-defense."

In its rebuttal, the State argued there was ample evidence that Bernard intended to kill Chauntelle, including the fact that he shot her multiple times in the back of the head after she had fallen to the ground:

> When you unload an entire 45-caliber magazine into the back of somebody's head, I think it's pretty clear what you're intending to do. You don't stand over somebody while they're facedown and unload a 45-caliber magazine if you're not intending to kill them.

The State argued that there was no evidence supporting Bernard's self-defense theory because there was no evidence that Chauntelle was waving her gun around inside the house or posed a threat to Trinell, Myrna, or the boys. According to the State, whether Bernard had a right to forcibly enter his home or who fired the first shot was immaterial because Bernard provoked Chauntelle to attack him in self-defense and Chauntelle had the right to use deadly force to protect herself from

---

[4] The State objected arguing defense counsel's argument was a misstatement of the evidence.

Bernard after he kicked open the back door and charged at her while brandishing a handgun. According to the State, Bernard tried to disarm Chauntelle because he knew she was a good shot, and he did not want her to be able to shoot back.

The jury implicitly rejected Bernard's self-defense claim and found him guilty of Chauntelle's murder. Following a bench trial on punishment, the trial court sentenced Bernard to thirty years in prison. This appeal followed.

## Self-Defense

In his first issue, Bernard argues the trial court erred in overruling his motion for directed verdict because "the evidence is insufficient to prove he committed murder rather than acting in self-defense." According to Bernard, no rational jury could have concluded that deadly force was not immediately necessary for him to defend himself from Chauntelle because viewing the evidence in the light most favorable to the verdict, a rational jury could have concluded only that (1) Chauntelle was armed when Bernard entered their home, (2) Chauntelle fired first, before any gunshot rendered her unable to return fire, and (3) Bernard shot Chauntelle only after she fired her gun at him.

In a single cross point, the State argues the trial court erred in charging the jury on self-defense because there is no evidence that (1) Bernard subjectively believed Chauntelle used or attempted to use unlawful force or unlawful deadly force against him and that his use of force or deadly force in response was immediately

necessary, (2) Bernard's subjective belief was objectively reasonable, or (3) Chauntelle used or attempted to use unlawful force or unlawful deadly force against Bernard.[5] The State further argues that Bernard was not entitled to a self-defense instruction because (1) "the undisputed evidence at the guilt/innocence stage showed that appellant provoked any attack upon him by Chauntelle," and (2) Bernard did not admit to murdering Chauntelle.[6]

Alternatively, in response to Bernard's first issue, the State argues there is sufficient evidence supporting the jury's verdict because the evidence shows that after some sort of altercation outside the back door, and without any further provocation from Chauntelle, Bernard armed himself, broke into the residence through the back door, advanced on Chauntelle from the back door of the residence, and shot at her repeatedly. While Chauntelle "may have gotten off a shot in self-defense against [Bernard's] attack," the State argues she did not shoot or otherwise injure Bernard. The State thus concludes that when viewed in the light most

---

[5] TEX. CODE CRIM. PROC. art. 44.01(c) ("The state is entitled to appeal a ruling on a question of law if the defendant is convicted in the case and appeals the judgment.").

[6] *See Lavern v. State*, 48 S.W.3d 356, 361 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("A defendant is not entitled to a charge on self-defense where there is no dispute that he provoked the other's use or attempted use of force."); *Rodriguez v. State*, 629 S.W.3d 229, 231 (Tex. Crim. App. 2021) ("Confession and avoidance is a judicially imposed requirement that requires defendants who assert a justification defense to admit, or at a minimum to not deny, the charged conduct."); TEX. PENAL CODE § 9.02 (stating "[i]t is a defense to prosecution that the conduct in question is justified under this chapter"); *id.* § 1.07(a)(10) (defining conduct as "an act or omission and its accompanying mental state").

favorable to the verdict, the evidence supports the jury's rejection of Bernard's self-defense claim.

## A.    Standard of Review

A defendant has the burden of producing some evidence to support a claim of self-defense.  *See Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018) ("The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue."); *see also London v. State*, 325 S.W.3d 197, 202 (Tex. App.—Dallas 2008, pet. ref'd).  The State bears the burden of persuasion to negate self-defense.  *See Braughton*, 569 S.W.3d at 608; *see also London*, 325 S.W.3d at 202.  The State's burden, however, "is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt."  *Braughton*, 569 S.W.3d at 608 (quoting *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)).

A jury's guilty verdict is an implicit finding rejecting a defendant's self-defense theory.  *London*, 325 S.W.3d at 202.  We review both legal and factual sufficiency challenges to the jury's rejection of self-defense under the *Jackson v. Virginia* standard.  *Rankin v. State*, 617 S.W.3d 169, 182 (Tex. App.—Houston [1st Dist.] 2020, pet. ref'd).  Under that standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable

26

doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Rankin*, 617 S.W.3d at 182. Viewed in the light most favorable to the verdict, the evidence is insufficient under this standard when either (1) the record contains no evidence, or merely a "modicum" of evidence, probative of an element of the offense, or (2) the evidence conclusively establishes a reasonable doubt. *Jackson*, 443 U.S. at 314, 319 n.11; *Rankin*, 617 S.W.3d at 182. An appellate court "may not re-evaluate the weight and credibility of the record evidence and thereby substitute [its] judgment for that of the fact-finder." *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). A motion for directed verdict is effectively a challenge to the sufficiency of the evidence and we thus review the denial of a motion for directed verdict under the standard set forth in *Jackson v. Virginia*. *See Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996) (citing *Jackson*, 443 U.S. at 307).

Under the *Jackson v. Virginia* standard, we defer to the jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Rankin*, 617 S.W.3d at 182 (internal citations omitted); *Mitchell v. State*, 590 S.W.3d 597, 604 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *see also Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007) (stating juries may draw multiple reasonable inferences from direct or circumstantial so long as each inference is supported by evidence). Because self-defense is a fact issue to be determined by the jury, the jury may accept or reject any

defensive evidence on the issue. *Mitchell*, 590 S.W.3d at 604 (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)). Where "there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous." *Braughton*, 569 S.W.3d at 608. We presume the "factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution." *Rankin*, 617 S.W.3d at 182.

## B.    Applicable Law

A person commits murder if the person "intentionally or knowingly causes the death of an individual" or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1)–(2). A jury may infer that the defendant intended to kill the complainant from the defendant's use of a deadly weapon and from other circumstantial evidence, including the defendant's acts, words, and the extent of the complainant's injuries. *See Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (stating jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon"); *Ex parte Weinstein*, 421 S.W.3d 656, 668 (Tex. Crim. App. 2014) (stating defendant's "intent to commit murder may also be inferred from circumstantial evidence, including his acts and words"); *Lopez v. State*, 672 S.W.3d 915, 923 (Tex. App.—

28

Corpus Christi–Edinburg 2023, pet. ref'd) ("Intent to kill may also be inferred from the nature and extent of the injuries inflicted on the victim.").

The use of deadly force in self-defense is a defense to prosecution for murder if the use of deadly force is "justified." TEX. PENAL CODE §§ 9.02, 9.31–.32. Section 9.31(a) of the Penal Code states that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a). The phrase "reasonably believes" contains "subjective and objective components." *Lozano v. State*, 636 S.W.3d 25, 32 (Tex. Crim. App. 2021). "A defendant must subjectively believe that another person used or attempted to use unlawful force . . . against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary." *Id.* The defendant's subjective belief, however, must be objectively reasonable. The reasonableness of the defendant's subjective belief is measured by the objective standard of an "ordinary and prudent man." *Id.* (quoting TEX. PENAL CODE § 1.07(a)(42)); *see also* TEX. PENAL CODE § 1.07(a)(42) (defining "reasonable belief" as one held by "an ordinary and prudent man in the same circumstances as the actor").

Section 9.32(a) of the Penal Code provides that a person's use of deadly force is justified "if the actor would be justified in using force against the other under

29

Section 9.31" and "when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." TEX. PENAL CODE § 9.32(a)(1)–(2)(A).

A defendant need not testify to raise the issue of self-defense. *See VanBrackle v. State*, 179 S.W.3d 708, 712 (Tex. App.—Austin 2005, no pet.) ("Defensive issues may be raised by the testimony of any witnesses, even those called by the State."); *see also Lavern v. State*, 48 S.W.3d 356, 360 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) ("While a non-testifying defendant may be entitled to a charge on self-defense, it is rare for the defense to be raised when the defendant fails to testify."). Nevertheless, there must still be some evidence of the defendant's subjective belief that another person used or attempted to use unlawful force against the defendant and that the defendant's use of unlawful or deadly force in response was immediately necessary. *See Lozano*, 636 S.W.3d at 32. When, as here, a defendant does not testify, the record must contain "observable manifestations" of the defendant's state of mind at the time of the alleged act of self-defense or some evidence from which the jury can infer the defendant had the requisite *mens rea*. *See VanBrackle*, 179 S.W.3d at 714; *see also Lozano*, 636 S.W.3d at 33 ("[A] person's belief, absent direct evidence, generally must be inferred from the circumstances of the case."). Observable manifestations of a defendant's state of mind include evidence that the defendant called for help during an altercation or told the

30

complainant, "I don't want to fight you . . . . leave me alone," as they struggled. *Smith v. State*, 676 S.W.2d 584, 585 (Tex. Crim. App. 1984).

**C.     Analysis**

Viewed in the light most favorable to the verdict, the record reflects that Chauntelle and Bernard had a physical altercation outside their home. At some point during the altercation, Bernard slapped Chauntelle. When Chauntelle and Bernard came back inside their house, Bernard grabbed his keys and walked outside to his truck, which was parked on the street in front of the house. After Bernard walked out the back door, Chauntelle deadbolted the back door and told her son Charlie to go upstairs. She also told her sister Trinell not to open the back door because Bernard had gone to get his gun.

Chauntelle, who looked worried, scared, and anxious, walked to the front of the house and she peered out a window in the direction of Bernard's truck. Moments later, Bernard, who was visibly enraged, kicked open the back door and walked inside with his Glock-45 in his hand. Bernard brushed past Trinell and continued to walk directly over to Chauntelle, who was standing in the front foyer and had, at some point before Bernard kicked open the back door, retrieved her gun. Bernard and Chauntelle began tussling. While they were struggling, both Chauntelle and Bernard fired their weapons towards the dining room. Bernard then stepped back and shot Chauntelle twice in the left side of her torso and once in the left side of her

31

head causing Chauntelle to fall to the ground. While Chauntelle lay on the ground motionless, Bernard stood over her body and fired six more rounds into the back of her head.

Although Chauntelle had retrieved her gun by the time Bernard kicked open the back door and advanced upon her, and there is some evidence that she fired at least one bullet from her gun, there is no evidence that Chauntelle pointed her gun at Bernard or fired her gun at Bernard. At most, viewed in the light most favorable to the verdict, the evidence reflects that Chauntelle fired her gun towards the dining room, but there is no evidence that Bernard was in the dining room or standing near it when the gun was fired.

A rational jury reasonably could have concluded from this evidence that Bernard was enraged when he kicked open the back door while holding his gun in his hand, and that he confronted Chauntelle in the front foyer. Chauntelle was afraid when Bernard went to get his gun, and she retrieved her own gun before he returned to protect herself. Bernard and Chauntelle immediately began tussling and they both fired their weapons in the direction of the dining room. Bernard then shot Chauntelle nine times at close range, including six shots to the back of her head as she lay motionless and bleeding on the floor. Although there is conflicting evidence over whether Chauntelle or Bernard fired the first shot, as the sole fact finder, it was the jury's province to resolve any conflicts in the evidence, and we defer to the jury's

resolution of the issue. *Rankin*, 617 S.W.3d at 182 (stating courts defer to jury to "fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts").

A rational jury also reasonably could have concluded that Bernard's conduct was inconsistent with his claim of self-defense because he shot Chauntelle nine times at close range, including six shots to the back of her head as she lay bleeding and motionless on floor. *See Cleveland v. State*, 177 S.W.3d 374, 381 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (stating jury could have reasonably concluded that defendant's conduct in continuing to stab his wife's back as she lay bleeding on floor was inconsistent with his claim of self-defense); *see also Russell v. State*, No. 05-17-00124-CR, 2018 WL 525559, at *6 (Tex. App.—Dallas Jan. 24, 2018, pet. ref'd) (mem. op., not designated for publication) ("Additionally, the jury could also reasonably infer that the sheer number of bullets that were fired—Tell was shot twelve times and Garcia was shot eight times—are beyond what can be considered immediately necessary to protect appellant from any action taken by either Tell or Garcia.").

A rational jury also reasonably could have concluded from this evidence that Bernard provoked Chauntelle to attack him as a pretext for shooting her when he kicked open the back door and charged at her visibly enraged while carrying his gun, , and thus rejected his self-defense claim. *See Elizondo v. State*, 487 S.W.3d 185,

33

196 (Tex. Crim. App. 2016) (stating if defendant provoked victim to get victim to attack on him, so that defendant would have pretext for killing victim, defendant has forfeited his right of self-defense); *Robins v. State*, No. 01-99-00451-CR, 2002 WL 1980887, at \*5 (Tex. App.—Houston [1st Dist.] Aug. 29, 2002, pet. ref'd) (mem. op., not designated for publication) (stating evidence defendant "drove home to pick up her handgun before seeking out" victim "tends to support an inference that [defendant's] provoking act was done with the intent of creating a pretext for the shooting").

In addition, there is no evidence that Bernard subjectively believed the use of deadly force was immediately necessary to protect himself from Chauntelle. There is no evidence Bernard made any statements before, during, or after the shooting indicating that he believed Chauntelle was using or attempting to use unlawful force or unlawful deadly force against him and that his use of force or deadly force in response was immediately necessary. *Compare with VanBrackle*, 179 S.W.3d at 714 (concluding evidence defendant "responded to this assault by grabbing the pistol, pushing it away, and calling for help" was observable manifestation of defendant's state of mind); *Smith*, 676 S.W.2d at 586 (concluding evidence defendant told complainant, "I don't want to fight you . . . . leave me alone," as they struggled was observable manifestation of defendant's state of mind). Although Chauntelle was holding a gun at some point during the confrontation at the front

door, evidence that Chauntelle was holding a gun is not evidence of Bernard's state of mind. *See Alaniz v. State*, No. 01-18-00599-CR, 2020 WL 97177, at *4 (Tex. App.—Houston [1st Dist.] Jan. 9, 2020, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that evidence complainant "took the knife out while mounted on [the defendant] and tried to use it" was evidence or "observable manifestation" of defendant's state of mind). At most, this evidence could support a finding that a person in Bernard's position could have reasonably believed that the use of deadly force was immediately necessary, but this is no evidence that Bernard held this subjective belief. *See Lozano*, 636 S.W.3d at 32 (stating defendant's subjective belief that use of deadly force is immediately necessary must be objectively reasonable when measured by objective standard of ordinary and prudent man).

To the extent Bernard challenges the sufficiency of the evidence supporting the jury's finding that he intended to kill Chantelle when he shot her, this argument is unavailing. In a homicide case, the defendant's state of mind is a question of fact for the jury to determine, and the jury may infer intent "from any facts in evidence which it determines proves the existence of such intent to kill, such as the use of a deadly weapon." *Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) (citing *Hall v. State*, 418 S.W.2d 810, 812 (Tex. Crim. App. 1967)). "It is both a common-sense inference and an appellate presumption that a person intends the

natural consequences of his acts and that the act of pointing a loaded gun at someone and shooting it toward that person at close range demonstrates an intent to kill." *Ex parte Thompson*, 179 S.W.3d 549, 556 n.18 (Tex. Crim. App. 2005) (internal citations omitted). Intent to murder can also be inferred from circumstantial evidence, such as a defendant's acts, words, and the extent of the victim's injuries. *See Ex parte Weinstein*, 421 S.W.3d at 668; *Lopez*, 672 S.W.3d at 923. Here, the jury rationally could have inferred that Bernard intended to kill Chauntelle when he shot her because he shot Chauntelle 9 times at close range, including 7 shots to her head which resulted in head injuries that were so extensive the medical examiner could not locate the extent of the wounds for each bullet. *See Lopez*, 672 S.W.3d at 923 (stating intent to kill can be inferred from extent of victim's injuries); *Brown*, 122 S.W.3d at 800 (stating intent to kill can be inferred from defendant's "use of a deadly weapon").

Viewing the evidence in the light most favorable to the verdict, we conclude a jury rationally could have found beyond a reasonable doubt that Bernard intentionally caused Chauntelle's death by shooting her nine times at close range and that Bernard did not reasonably believe that deadly force was immediately necessary to protect himself against Chauntelle's use or attempted use of unlawful deadly force, thus rejecting Bernard's self-defense claim. *See Jackson*, 443 U.S. at 318–19; *Rankin*, 617 S.W.3d at 184.

We overrule Bernard's first issue.[7]

## Exclusion of Expert Testimony During Punishment Hearing

In his second issue, Bernard argues the trial court abused its discretion during the punishment phase by excluding testimony about bullet wounds and bullet trajectory from Rachel Fischer, Bernard's forensic nursing expert. The State argues that Bernard failed to preserve this issue for our review because he did not timely present a bill of exception or other offer of proof regarding the testimony Fischer would have offered. The State further argues that even if Fischer had preserved this issue, he would not prevail on appeal because the trial court did not abuse its discretion in finding that Fischer's testimony was inadmissible.

## A.    Punishment Hearing

During the punishment phase of trial, Bernard called several work colleagues from the United States Customs and Border Protection agency who testified about Chauntelle's volatile, aggressive, and abusive behavior at work. Bernard, who

---

[7]    Because we conclude there is sufficient evidence supporting the jury's rejection of Bernard's self-defense claim, we need not reach the State's cross issue that Bernard was not entitled to a jury instruction on self-defense. *See Pfeiffer v. State*, 363 S.W.3d 594, 601 (Tex. Crim. App. 2012) ("Usually, courts of appeals may address the State's cross-appeal point only if the defendant prevails on appeal and the case will be remanded for further proceedings."); *Seghelmeble v. State*, 390 S.W.3d 576, 583 (Tex. App.—Dallas 2012, pet. ref'd) (affirming trial court's judgment and declining to consider State's cross-appeal challenging inclusion of instruction in jury charge because State would derive no benefit from opinion in its favor and thus opinion would be advisory).

testified during the punishment phase of trial, also called a police officer who responded to a domestic dispute at the Bernards' home in 2014, and Rachel Fischer, a forensic nurse.

Bernard testified about his tumultuous relationship with Chauntelle and the circumstances surrounding her death. According to Bernard, Chauntelle began abusing him verbally shortly after they were married, and she eventually began hitting, punching, choking, and kicking him. Bernard, who denied ever hitting Chauntelle, testified that the physical abuse occurred frequently, and the verbal abuse was daily. Although he did not tell any of his friends or family about the abuse, in 2014, Bernard called the police because Chauntelle jumped on him while he was asleep and began choking him and repeatedly hitting him over the head with a blunt object. Bernard also reported the 2014 incident to Chauntelle's supervisor at work, but nothing came of it at that time.

Bernard testified that Chauntelle threatened him a couple of weeks before the shooting. According to Bernard, Chauntelle was under a lot of stress at work, and she was concerned that the 2014 domestic violence report would be brought up. Bernard testified that Chauntelle was so concerned about the 2014 report that she told him "if you get me fired from this job, I'm going to f**king kill you."

Bernard testified that on Thanksgiving day, Alison hugged him around the neck when then they were saying goodbye, and after Alison drove away, Chauntelle

38

began slapping and punching him, even after they both fell the ground. Bernard denied doing anything to provoke the attack. When he was able to get free, he told Chauntelle that he was going to call 911. At that point, Chauntelle began "talking about don't disrespect me in my house, don't disrespect me with that bitch, at which point I said, you're crazy and I'm leaving." Although he did not understand at the time, Bernard testified that he believed Chauntelle was referring to Alison's hug.

Bernard walked back inside the house to get his keys and then started to leave through the back door. Chauntelle walked in the back door as Bernard was leaving. Bernard turned around when he realized he forgot his wallet. When he reached the back door, Bernard testified that he saw Chauntelle and Trinell arguing, and Chauntelle yelling and pointing a handgun in Trinell's face. After bearing the brunt of Chauntelle's abusive behavior for years, and seeing Chauntelle's aggressive behavior towards Trinell, Bernard feared that his family was in "immediate danger," and he decided to try to disarm Chauntelle and deescalate the dangerous situation.

Bernard testified that although he approached Chauntelle with both hands raised and empty and he pleaded for her to put down her weapon, Chauntelle pointed her gun in Bernard's face, and told him to "just f**king die." He and Chauntelle struggled as he tried to take the gun from her, but she pointed the gun at him again and fired. Bernard testified that when Chauntelle shot at him, it felt "like hot sand burning a hole in my head, burning my eyes out," and he was scared for his life and

went into "autopilot mode." Out of his right eye, Bernard saw Chauntelle, who was "still standing and she's turning" with her gun in her hand, and he "just fire[d] and fire[d]." When he realized that he had shot Chauntelle, Bernard placed his gun on the kitchen counter and called 911.

Rachel Fischer, a forensic nurse, who specializes in, among other things, domestic violence and "the forensic evaluation of gunshot wounds" testified after Bernard. After discussing her qualifications, Fischer gave extensive testimony about the power and control dynamics and cycles of abuse present in domestic violence relationships and about a victim's response to trauma. Fischer testified that the events leading up the shooting, as testified to by Bernard, illustrated the cycle of violence present in domestic violence and that Bernard's behavior, including not reporting the abuse, staying in the relationship, and showing little emotion after Chauntelle's death, was consistent with domestic abuse victims. According to Fischer, when confronted with a traumatic experience, a person typically responds by fighting back, fleeing, or freezing. When asked how Bernard had responded the night of the shooting, Fischer testified that Bernard had "a fight response" and he "fought and killed the threat that was perceived by him." "So, a [gun] barrel being pointed at your face and seeing that, whether the trigger was pulled or not, that is a threat of imminent danger, and that goes back to the survival instinct of fight or flight. You respond to a threat in survival mode of how do I survive this[?]." Fischer

testified that Bernard's response was not surprising to her given his testimony regarding the years of abuse he endured.

On cross-examination, Fischer testified that she did not hear the testimony presented during the guilt-innocence phase of trial, and her opinions were based primarily on Bernard's testimony during the punishment phase. On redirect examination, Bernard's counsel asked Fischer:

Defense: Okay. And you've seen all the evidence that we've had in this case we've made available and you've viewed that. Correct?

Fischer: I have not viewed all of it.

Defense: Okay. But you have reviewed specific evidence on the forensics; is that correct?

Fischer: Yes.

Defense: Okay. And in your viewing that, is that consistent with [Bernard's] account of what he told you happened?

Fischer: In viewing the photos of the trajectory of the bullets and with the basic review I've done, yes, it's consistent.

State: Judge, I'm going to object. This would be outside this witness' expertise to testify about trajectory of bullets.

Defense: Your Honor, she's a forensic nurse and she's -- I mean, we can qualify her for that and further expound on that.

Court: Well, I think that's probably outside the scope of this witness. Please move on.

Defense: I'll move along.

41

Bernard did not make an offer of proof or informal bill of exception after the trial court excluded Fischer's testimony about "trajectory of bullets." Instead, Bernard made a formal bill of exception after trial and after sentencing. In her affidavit attached to the formal bill of exception, Fischer stated that if she had been allowed to expand on her testimony, she would have testified about her qualifications to testify as "an expert to the trajectory of a bullet/bullets," the details of which are not necessary for purposes of our analysis. Fischer stated:

> The pattern of the wound to the left upper arm of Chauntelle Bernard showed characteristics of an entrance wound that had a trajectory moving anteriorly from the distal point of reference of her left hand, travelling posteriorly from her left hand toward her left shoulder.
>
> This would be consistent with the review of the files pertaining to the case and the history given of Ms. Bernard, being left handed, pointing a gun toward Mr. Bernard, with her left arm outstretched and the bullet from Mr. Bernard's gun firing toward her creating this linear, angled entrance wound with a comet tail abrasion collar in the wound bedding.
>
> The wound to the left side of Ms. Bernard has an entrance wound with a trajectory of a bullet entering from upwards and slightly anterior to downwards and posteriorly. This would be consistent with the history given of the two of them "tussling" and in close proximity as Mr. Bernard testified to that I was trying to disarm her[]. If there was a line of questioning continued on from the initial question, had it been allowed, more relevant details could have been brought up and elaborated on. There are many aspects of the gunshot wound evidence reviewed that would have been helpful for the court to hear during my testimony.
>
> The wounds on the back of the head have wound characteristics that show multiple angles and trajectories of entrance which is consistent with the history given by Mr. Bernard of, "She's still standing and she's

42

turning and I just fire and fire". The entrance wounds are not from one angle repetitively.

The State argues that Bernard did not preserve this issue for our review because his formal bill of exception was not timely, and even if were timely, the trial court did not abuse its discretion by excluding Fischer's testimony.

## B.    Harmless Error

Even assuming, without deciding, that Bernard preserved this issue for our review and the trial court abused its discretion by excluding Fischer's expert testimony regarding bullet wounds and bullet trajectory, we cannot reverse on this basis unless Bernard was harmed by the error. *See* TEX. R. APP. P. 44.2. All errors are subject to harmless error analysis under Texas Rule of Appellate Procedure 44.2, except for a very narrow category of errors defined by the United States Supreme Court as "structural" errors.[8] Although a defendant does not bear the burden to prove

---

[8]    Structural errors comprise a narrow class of cases involving the deprivation of federal constitutional rights. *See Johnson v. State*, 169 S.W.3d 223, 235 (Tex. Crim. App. 2005) (citing *Johnson v. U.S.*, 520 U.S. 461, 468–469 (1997)); *see also Arizona v. Fulminante*, 499 U.S. 279, 310 (1991) (structural error is error of constitutional magnitude that "affect[s] the framework within which a trial proceeds rather than simply an error in the trial process itself"). The United States Supreme Court has defined the following errors as structural: (1) lack of an impartial trial judge; (2) the unlawful exclusion of members of the defendant's race from a grand jury; (3) the denial of the right to self-representation at trial; (4) the denial of the right to a public trial; (5) an instruction that erroneously lowers the burden of proof for conviction below the "beyond a reasonable doubt" standard; and (6) the total deprivation of counsel. *See Johnson*, 520 U.S. at 468–69; *see also U.S. v. Davila*, 569 U.S. 597, 611 (2013) (stating structural errors constitute "highly exceptional category" of errors). The Texas Court of Criminal Appeals plurality decision in *Lake v. State*, 532 S.W.3d 408 (Tex. Crim. App. 2017) indicates that a very narrow

harm, he must still brief the question of harm and provide supporting arguments, substantive analysis, and appropriate citations to authorities and to the record to avoid briefing waiver. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013) ("Neither the State nor the defendant has a burden to prove harm."); *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (holding defendant waived issue on appeal because he failed to address whether alleged error was harmful); *see also* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain "a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"). An appellate court has no obligation to construct and compose issues, facts, and arguments with appropriate citations to authorities and the record for the appellant. *See Wolfe v. State*, 509 S.W.3d 325, 343 (Tex. Crim. App. 2017).

In his opening brief, Bernard does not identify the applicable rule for assessing whether the exclusion of evidence was harmful, cite to any applicable legal authorities, or attempt to apply the law to the facts of his case. Bernard neither argues he was harmed because the trial court excluded Fischer's expert testimony, nor does he assert that this alleged error fits one of the very narrow exceptions that are immune from the harmless error analysis. He merely states, without more, that

---

class of non-structural errors may also be immune to a harmless error analysis. *Id.* at 411 (citing *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) ("Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error . . . is categorically immune to a harmless error analysis.")).

44

the excluded testimony would have aided the trial court in assessing the appropriate sentence. He argues that Fischer's excluded testimony was "relevant to the judge's consideration of proper sentencing, with a range of punishment starting at 5 years, and [Bernard] received 30 years, anything tending to assist the trier of fact in its task of determining mitigation in sentencing."

The State responds that Fischer's "testimony concerning bullet trajectory and the positioning of Chauntelle's body when shot" is not relevant because "at the punishment stage of a criminal trial, evidence is not admissible for the purpose of relitigating the defendant's guilt." In his reply brief, Bernard addresses the State's argument and argues that Fischer's testimony is relevant because it shows "the mitigating fact he had a 'fight response' to Chauntelle pointing a gun at him based on his past 'traumatic experiences' with Chauntelle" and that "the physical evidence was consistent with [Bernard's] testimony concerning the mitigating circumstance of sudden passion."

### 1. Sudden Passion

At the punishment phase of a murder trial, a defendant may reduce a murder charge from a first-degree felony to a second-degree felony by establishing he committed the murder under the immediate influence of sudden passion arising from an adequate cause. *See* TEX. PENAL CODE § 19.02(d) (stating "defendant may raise the issue as to whether he caused the death under the immediate influence of sudden

45

passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree."); *see generally McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating "[s]udden passion is a mitigating circumstance" that can be raised during punishment phase). "Sudden passion" is defined as "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "Adequate cause" is defined as "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

In his reply brief, Bernard argues that Fischer's testimony is relevant because it shows "the mitigating fact he had a 'fight response' to Chauntelle pointing a gun at him based on his past 'traumatic experiences' with Chauntelle" and that "the physical evidence was consistent with [Bernard's] testimony concerning the mitigating circumstance of sudden passion." It is unclear whether in using the phrase "sudden passion," Bernard is referring to the definition of "sudden passion" in Section 19.02(a)(2) of the Penal Code or the defensive issue set forth in the Section

46

19.02(d).[9] *See id.* § 19.02(d) (stating if defendant proves "in the affirmative by a preponderance of the evidence" that he caused complainant's death "under the immediate influence of sudden passion arising from an adequate cause," "the offense is a felony of the second degree"); *id.* § 19.02(a)(1) (defining adequate cause); *id.* § 19.02(a)(2) (defining sudden passion).[10]

To the extent Bernard argues that he was entitled to a different range of punishment based on the defensive issue of sudden passion, we reject his argument because he did not preserve that issue below. *See* TEX. R. APP. P. 33.1(a)(1) (requiring defendant to raise complaint in trial court "by a timely request, objection, or motion"); *see generally Simpson v. State*, 548 S.W.3d 708, 710–11 (Tex. App.— Houston [1st Dist.] 2018, pet. ref'd) (holding defendant must request instruction on sudden passion to preserve error because sudden passion is defensive issue). During the punishment phase of trial, Bernard did not explicitly raise the defensive issue of sudden passion or ask the trial court to find that he shot Chauntelle while acting

---

[9]      *Cf. Green v. State*, No. 09-07-00568-CR, 2009 WL 857612, at \*4 n.6 (Tex. App.— Beaumont Apr. 1, 2009, pet. ref'd) (mem. op., not designated for publication) (stating "some reviewing courts have used the words 'sudden passion' as shorthand for the entire punishment mitigation issue as set out in section 19.02(d) ("caused the death under the immediate influence of sudden passion arising from an adequate cause"), and not just the singular term-of-art defined in section 19.02(a)(2)").

[10]      Bernard also did not raise his sudden passion argument on appeal until his reply brief. *See Ward v. State*, No. 14-15-00473-CR, 2016 WL 6238339, at \*4 (Tex. App.—Houston [14th Dist.] Oct. 25, 2016, pet. ref'd) (mem. op., not designated for publication) (stating argument not raised until reply brief was waived).

under the influence of sudden passion, which would have entitled Bernard to an assessment of punishment based on a second-degree felony as opposed to a first-degree felony. The range of punishment for a second-degree felony is no more than 20 years or less than 2 years, as opposed to a first-degree felony, which is punishable by life imprisonment or a term not more than 99 years or less than 5 years. *See* TEX. PENAL CODE § 19.02(d) ("If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree."); *id.* § 12.32(a) (punishment range for first-degree felony); *id.* § 12.33(a) (punishment range for second-degree felony). Instead, in his closing argument, Bernard's defense counsel argued only that:

> [Bernard] was provoked by his wife and responded in an instant of fear and terror. You heard from [Bernard's] testimony that he was looking down the barrel of her gun and he goes into autopilot. That was his trauma response to eliminate the threat, and he did so. He did not want to kill his wife. . . . He was merely responding in that moment, in a traumatic situation, after enduring years of abuse that he tried so hard to hide.

And on appeal, Bernard argues that Fischer's testimony was relevant to proper sentencing under a first degree felony by arguing that the testimony was "relevant to the judge's consideration of proper sentencing, with a range of punishment *starting at 5 years*, and [Bernard] received 30 years . . . ." (Emphasis added). *Compare* TEX. PENAL CODE § 12.32(a) (punishment range for first-degree felony), *with id.* § 12.33(a) (punishment range for second-degree felony). Bernard thus did

not preserve the defensive issue of sudden passion for our review, and we understand his appellate argument to refer merely to the definition of sudden passion, which we address below.[11]

### 2. Cumulative Mitigating Evidence

In his reply brief, Bernard argues that "Fischer's testimony was crucial to demonstrating that the physical evidence supported [his] testimony regarding the shooting, showing [his] sudden passion and further proving the mitigating circumstances surrounding is actions." Assuming Bernard properly presented a bill of exception to preserve this issue and that the trial court erred in excluding Fischer's testimony, we conclude the error was harmless. The erroneous exclusion of evidence is harmless if the evidence is cumulative of other evidence, or the nature of the evidence is established through other means. *See Robison v. State*, 461 S.W.3d 194, 200, 202 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd); *Lindsay v. State*, 102 S.W.3d 223, 230 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (holding erroneous exclusion of cumulative evidence is harmless).

---

[11]  Even if Bernard had expressly raised the defensive issue of sudden passion in the trial court and requested a finding on the issue, we note that Bernard is not arguing on appeal that the evidence is legally and factually insufficient to support the trial court's rejection of his claim of sudden passion. *See Matlock v. State*, 392 S.W.3d 662, 667 & n.14 (Tex. Crim. App. 2013) (stating sudden passion, which is akin to an affirmative defense, may be evaluated for legal and factual sufficiency).

During the punishment phase of trial, Bernard testified that he had a tumultuous relationship with Chauntelle. He testified that Chauntelle verbally and physically abused him by hitting, punching, choking, and kicking him. According to Bernard, the physical abuse occurred frequently, and the verbal abuse was daily. In 2014, he reported a domestic violence incident to the police and to Chauntelle's supervisor at work. He also testified that Chauntelle threatened him a couple of weeks before the shooting, telling him, in reference to the 2014 report, "if you get me fired from this job, I'm going to f**king kill you." Turning to the shooting on Thanksgiving day, Bernard testified that Chauntelle provoked him when she tried to shoot him at close range, which made him fear for his life, causing him to immediately go into "autopilot mode," and start shooting at Chauntelle. If believed, this would have provided some evidence that Bernard acted under the influence of "passion directly caused by and arising out of provocation" by Chauntelle which arose "at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2) (defining sudden passion); *see McKinney*, 179 S.W.3d at 569 (stating sudden passion requires proof of adequate provocation, that "passion or an emotion such as fear, terror, anger, rage, or resentment existed[;] that the homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion, and the homicide").

50

Fischer testified at length about the power and control dynamics and cycles of abuse present in domestic violence relationships and a victim's response to trauma. She testified that the events leading up the shooting as testified to by Bernard illustrated the cycle of violence present in domestic violence and that Bernard's behavior, including not reporting the abuse, staying in the relationship, and showing little emotion after Chauntelle's death, was consistent with domestic abuse victims. She explained that Bernard had "a fight response" and he "fought and killed the threat that was perceived by him." "So, a [gun] barrel being pointed at your face and seeing that, whether the trigger was pulled or not, that is a threat of imminent danger, and that goes back to the survival instinct of fight or flight. You respond to a threat in survival mode of how do I survive this[?]" Relevant to Bernard's argument on appeal, Fischer also testified that Bernard's account of the shooting was consistent with the forensic evidence she had reviewed, including the "photos of the trajectory of the bullets." It was only after this testimony, that the State objected to Fischer offering additional testimony on bullet trajectory.

According to Bernard, and the bill of exception offered by Fischer, had Fischer been allowed to testify, she would have testified about her qualifications to testify as "an expert to the trajectory of a bullet/bullets" and she would have offered more details about the pattern of wounds and trajectory of the bullets. Dr. Murphy, the medical examiner, had already testified during the guilt-innocence phase of trial

about Chauntelle's bullet wounds and the paths the bullets took through her body.[12]

Thus, at most, Fischer's excluded testimony would have provided additional details supporting her already admitted opinion that the forensic evidence was consistent with Bernard's account of the shooting:

Defense: Okay. But you have reviewed specific evidence on the forensics; is that correct?

Fischer: Yes.

Defense: Okay. And in your viewing that, is that consistent with [Bernard's] account of what he told you happened?

Fischer: In viewing the photos of the trajectory of the bullets and with the basic review I've done, yes, it's consistent.

Considering the excluded evidence in relation to other similar evidence presented to the trial court, we cannot say that the exclusion of Fischer's testimony concerning bullet wounds and bullet trajectory had a substantial and injurious effect or influence in determining Bernard's punishment. *See Robison*, 461 S.W.3d at 202; *Lindsay*, 102 S.W.3d at 230.

---

[12] At the beginning of the punishment phase of trial, the trial court granted the State's motion to re-admit all of the evidence previously offered and admitted during the guilt-innocence phase of trial. We note, however, that as the factfinder during the trial on punishment, the trial court was at liberty to consider the evidence admitted at trial during the guilt-innocence phase even if the State had not moved to re-admit the evidence. *See Rayme v. State*, 178 S.W.3d 21, 27 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd) (stating "the evidence admitted in the guilt-innocence phase of trial may be considered by the jury during the punishment phase regardless of whether the State moves to re-admit it") (citing *Duffy v. State*, 567 S.W.2d 197, 208 (Tex. Crim. App. 1978)).

We overrule Bernard's second issue.

## Conclusion

We affirm the trial court's judgment.

Veronica Rivas-Molloy
Justice

Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).